### ADA HAYMOND V. B. W. HAYMOND.

### No. 6706.

1. **Divorce—Jurisdiction.**—An allegation that plaintiff "is a bona fide citizen of the county of Bell, State of Texas, and has been for more than six months before the filing of this petition," is not the equivalent of the provision in Revised Statutes, article 2862, that the petitioner "shall at the time of exhibiting his petition be an actual bona fide inhabitant of the State, and shall have resided in the county where the suit is filed six months next preceding the filing of the suit," and a demurrer should have been sustained to it.

2. **Same—Actual Inhabitant—Residence.**—Such actual inhabitancy as required by the statute was not shown when it appeared that in 1881 plaintiff left his home and family in Bell County, Texas, and resided in Central America from 1881 to December, 1885, and again from January, 1886, to October, 1887, the suit having been filed October 10, 1887.

3. **Temporary Absence.**—A temporary absence from the State or county of an inhabitant of the State during the six months next preceding the filing of the suit would not affect the right of the plaintiff to maintain it.

4. **Jurisdiction.**—When residence in the county for six months before the suit is negatived, a divorce should be refused.

5. **Religious Opinions in Divorce.**—In view of the constitutional provisions securing to "all men the right to worship Almighty God according to the dictates of their own consciences," and asserting that "no human authority ought in any way whatever to control or interfere with the right of conscience in matters of religion," we do not think that questions as to the doctrines or practices of the sanctificationists ought to have been permitted to enter to any extent into the trial. Pleadings alleging them and evidence showing them should have been excluded.

6. **Other Separations.**—Testimony to other separations caused by the prevalence of the religious views in question should have been excluded as irrelevant.

7. **Abandonment.**—See facts insufficient to show abandonment of husband by wife.

8. **Abandonment—Change of Domicile.**—While generally the husband has the right to decide where the matrimonial domicile shall be; and if he changes his residence and the wife declines to go with him she thereby deserts him, yet there may be places to which the wife would not be required to change her domicile, or be held guilty of desertion of her husband so as to entitle him to a divorce for that cause.

9. **Custody of Children.**—The custody of the minor children in divorce cases is a question of the welfare of the children rather than of deference to the affections or feelings of the parents.

APPEAL from Bell. Tried below before Hon. W. A. Blackburn. The opinion states the case.

*Monteith & Furman* and *Frank Andrews,* for appellant. — 1. The court had no jurisdiction on account of the non-residence of the plaintiff. Rev. Stats., art. 2862; Jones v. Jones, 60 Texas, 454; Harvard College v. Gore, 5 Pick., 377; State v. Ross, 3 Zab., 517; Lee v. City of Boston, 2 Gray, 490.

2. The court erred in overruling defendant's special demurrer to that part of plaintiff's petition setting up as a cause of action the religious belief of defendant and her mother, as the same is not one of the grounds

of divorce given by the statute. Const. of Texas, art. 1, sec. 6; Rev.
Stats., arts. 1187, 2861; Rules for the Dist. Ct., No. 1, p. 20.

3.   The court erred in permitting witnesses for the plaintiff to testify
over the objections that there had been separations between other spouses
not connected with this suit, because it was irrelevant and the effect of
the same would prejudice the rights of the defendant before the jury.
Ross v. Kornrumpf, 64 Texas, 390; Patton v. Gregory, 21 Texas, 513;
Smith v. Hughes, 23 Texas, 249.

4.   On abandonment.   Rev. Stats., arts. 1317, 2861, subd. 2; Pinkard
v. Pinkard, 14 Texas, 356; McGowen v. McGowen, 52 Texas, 657.

5.   On custody of the minor children.   Rev. Stats., arts. 2860, 2861,
2871; Jacob's Fisher's Dig., Infant, p. 6435; Ball v. Ball, 2 Sim., 35;
Custis v. Custis, 5 Jur., N. S., 1147; 2 Sim., N. S., 54; Curtis v. Curtis,
1 Serg. & R., 192; Rev. Stats., art. 1337.

*James Boyd,* for appellee, cited Zacharie v. Bryan, 2 Texas, 274; Prew-
ett v. Travis, 5 Texas, 517; Sheffield v.·Sheffield, 3 Texas, 87; Wright v.
Wright, 6 Texas, 17; Jones v. Jones, 60 Texas, 460; Scott v. Scott, 61
Texas, 120; Bishop on Mar. and Div., 2 ed., 509, 513, 514; Patton v.
Gregory, 21 Texas, 513.

HENRY, ASSOCIATE JUSTICE.—B. W. Haymond instituted this suit
against his wife for divorce and for the custody of their three children.
Plaintiff alleged that he was married to defendant in the year 1873.
"That in January, 1879, there crept into his home a destroyer that
lodged in the bosom of his family and poisoned the atmosphere of his
once happy home, blighted his life, alienated his wife's affections, es-
tranged his children, and made desolate all that was once happy and
comfortable."   He alleged that "this destroyer was a band of religious
fanatics calling themselves sanctificationists, composed chiefly of women
who congregate at private houses and other places and relate to each
other the divine revelations communicated to them, which they interpret
to suit their own views and then blindly follow in their business and do-
mestic relations.

"That Martha McWhorter, the mother of defendant, is the head of
this sect, and seems to have the benefit of more revelations than all the
others, and her interpretations thereof are law to her followers."

Plaintiff further charges "that this band teach and enforce the
doctrine that it is sinful for a wife who is a member to live with a hus-
band who does not believe the doctrine; that such a husband is a serpent
in the house and the wife should separate and depart from him."

He alleges that "in 1879 his wife joined this band at the solicitation
of her mother, and during his temporary absence permitted the band to

hold its meetings in his house, and encouraged them to instill into the minds of his children their accursed doctrines.

"That influenced by her mother, who taught her it was a sin to live with him, defendant withdrew herself from plaintiff's bed and board in January, 1879, but occupied a room and bed in another part of the house, and has ever since remained absent from his bed and board.

"That said Martha McWhorter has induced other wives to refuse to live with their unbelieving husbands.

"That plaintiff in 1883 sent his children a barrel of oranges, which his mother-in-law destroyed because he was an unbeliever.

"That plaintiff was absent from the State from October, 1881, until December, 1885. In 1883 he wrote to his wife from Central America, expressing a desire to forget the past and blot it out of their lives if she would go to him with their children and remain until he was able to return to Texas," offering to send her money to pay her expenses. Defendant refused, saying she would not leave the sanctified band for any man, and that money would be no inducement to her to live with him. He charges that "on his return home in 1885 he was very sick and needed care and attention which he received from strangers but not from his wife, who knowing his condition did not visit or send his children to see him; and that after his recovery, in January, 1886, still desiring to reunite his family and separate them from the sanctificationists and intermeddlers, he sought his wife and besought her to go with him and reunite their family and forget and forgive the past, in reply to which she said she would consult her mother and find what revelation would be made on the subject."

Plaintiff alleges that not hearing from his wife he wrote her at the end of several days, repeating his request, to which she replied that she could not consistently with her faith live with him because he was an unbeliever.

He alleges that with the consent of his wife her mother has taken complete control of their children and hires them out to do menial work, receiving the money for their services and refusing to send them to school, and that Martha McWhorter is the proprietress of the Central Hotel, where she has kept plaintiff's wife and children, and has knowingly permitted public prostitutes to board and lodge as her guests, thus associating his children with them.

Plaintiff charges that in consequence of said excesses and cruel treatment his living with defendant is insupportable, and he prays for a divorce for that reason and because of defendant's voluntary abandonment of him for the period of three years and more prior to the filing of his petition.

Defendant excepts to so much of the petition as relates to her religious belief and that of her mother, and denies all and singular its allegations.

She specially denies that plaintiff's residence is in Texas and charges that he is a resident of British Honduras, and that instead of her leaving him plaintiff abandoned her. She alleges that he was habitually cross to her, and on one occasion violently assaulted her and circulated false charges against her character.

She charges that from 1881 to 1885, while he was in Central America, he left her no provision for the support of herself or children, and that she furnished such support by her own efforts, and in 1885 he deprived her of the rent of their home.

She charges that plaintiff remained in Central America until 1887, when he returned to Belton and forcibly and fraudulently carried away her son, whom she had supported for the previous seven years without his assistance. She says her children are attached to and prefer to remain with her, and that she is able to care for and support them, and that plaintiff if he obtains control of them will remove them to some foreign country.

Plaintiff introduced the deposition of Mrs. Martha McWhorter, by whom he proved that perfect harmony never existed between him and his wife, though they were sometimes pleasant to each other. She testified that her faith does not teach that it is sinful for a believing wife to live with an unbelieving husband as his wife if they were already married when the wife became sanctified; that the faith of the sanctificationists teaches them to be good and obedient wives and mothers, and to discharge their duties perfectly as such, and teaches that if a husband chooses to leave his wife on account of her religion she should let him go. She testified that plaintiff and his wife did not live together from January, 1879, to February, 1881, and that plaintiff " was always more or less disagreeable in his family;" that disagreements continued between them until they finally separated, when plaintiff endeavored to eject his wife by force from their house, but he failed to eject her and afterwards left her of his own accord; that they differed about business matters as well as religious, and that some meetings of the band were held in the residence of plaintiff by invitation of his wife.

She testified that a half barrel of oranges came to defendant, but not knowing who sent them she withheld the oranges because she did not believe in accepting gifts from an unknown source; and that when plaintiff was sick in 1885 friendly relations did not exist between him and his wife, and she did not visit him.

She testified that in the early part of 1886 plaintiff requested his wife to live with him again, but she declined because she desired to live in peace and was fully convinced that there would be none in the "same house with Ben Haymond; we both concluded she had better not go with him for that reason."

She testified that in 1883 or 1884 plaintiff wrote his wife from Central

America requesting her and his children to join him there, and offering to send them the money required for the purpose, but defendant refused to go.

The same witness, testifying at the instance of the defendant, stated that plaintiff had never contributed anything for the support of his wife and children after he left for Central America in 1881; that plaintiff and his wife occupied the same room and bed until he tried to eject her from their house, after which defendant remained in the same room and plaintiff withdrew to another one, which he continued to occupy until he departed for Central America.

Other evidence was introduced by plaintiff, in substance, that Mrs. McWhorter was the leader of the band, and that while they do not teach separation between married people, such is the tendency of their doctrines; that the doctrine had caused separation of husbands and wives in four other instances, giving the names of parties living at Belton.

The evidence failed to sustain the allegations with regard to the evil character of occupants of the hotel kept by the mother of defendant, and of her children being subjected to evil associations, and as to their being hired out to perform menial labor, but established quite the contrary in these particulars.

Plaintiff failed to fully prove the circumstances of the final separation between himself and wife occurring in 1881. The daughter of plaintiff, introduced as a witness by defendant, corroborates Mrs. McWhorter upon that point by stating that in 1881 plaintiff made a violent assault upon defendant, attempting to put her out of the house, after which defendant continued to occupy the same room, but plaintiff occupied a different one.

When plaintiff left her defendant was residing in their house; afterwards she rented it for fifteen dollars per month until 1885, when by plaintiff's direction the rent was not allowed to go to her any longer.

The evidence shows that after plaintiff's departure in 1881 he furnished nothing towards the support of his wife and their three minor children, but that all were maintained and the children educated by the exertions of the wife, with such assistance as her mother gave her.

On the verdict of a jury a decree was rendered granting plaintiff a divorce and giving to him the custody of the three children.

Plaintiff charges that he "is a bona fide citizen of the county of Bell, State of Texas, and has been for more than six months before the filing of this petition."

It is objected that the court erred in overruling defendant's demurrer to the petition because it failed to charge that plaintiff was an actual bona fide inhabitant of Bell County, in the State of Texas.

Article 2862 of our Revised Statutes directs that "no suit for divorce from the bonds of matrimony shall be maintained in the courts unless the petitioner for such divorce shall at the time of exhibiting his or her

petition be an actual bona fide inhabitant of the State, and shall have resided in the county where the suit is filed six months next preceding the filing of the suit."

Plaintiff's allegations may be true, and he still may not have been an actual bona fide inhabitant of this State and resident of Bell County for six months next preceding the filing of his petition for divorce.

The allegations in the petition are not the equivalents of the facts required by the statute, and we think the demurrer should have been sustained.

Even if the allegations in this respect had been sufficient we do not think they were supported by the evidence, which shows the plaintiff resided in Central America from 1881 to December, 1885, and again from January, 1886, until October, 1887.

It is shown that he was a resident of Bell County before going to Central America, and there is some evidence that that he never intended to permanently abandon his domicile in this State.

We do not think that a temporary absence from the State or county of an inhabitant of the State during the six months next preceding the filing of his petition for divorce would affect his right to maintain it.

We think, however, that there may be such a residence abroad, without the loss of citizenship or domicile for other purposes, as will cause the provisions of the statute referred to to be applicable and deprive the party of the right to maintain a suit for divorce in our courts.  Plaintiff's nonresidence was of this character, and when it was developed by the evidence his suit ought to have been dismissed.

One condition to which a party seeking a divorce in this State is subject is that he must reside in the county in which he brings his suit for the six months next preceding the filing of his petition.  The fact that he was at some previous time a citizen and actual inhabitant of the State, and for six months and more a resident of the county, in no manner affects the question.  When the facts required to exist by our statutes are not established by the evidence a decree of divorce should be refused.

We think the special exception to so much of the petition as sets out the religious opinions of defendant and her mother should have been sustained.

In view of the constitutional provisions securing to "all men the right to worship Almighty God according to the dictates of their own consciences," and asserting that "no human authority ought in any case whatever to control or interfere with the rights of conscience in matters of religion," we do not think that questions as to the doctrines or practices of the sanctificationists ought to have been permitted to enter to any extent into the trial, and on objection they should have been eliminated from the pleadings and the evidence.  It was defendant's right to have any religious belief, or none, as best suited her.  If her conduct as a wife

was such as to furnish her husband grounds for divorce, the acts themselves would be the only proper subjects of investigation, without any regard to the religious convictions that led to them.   If her conduct was blameless it was useless to allege and prove that her religious connections inculcated evil views and practices.

The petition charges that she abandoned her husband for more than three years before he filed his suit.   It was not necessary, nor did it help to prove the essential fact of abandonment, for the plaintiff to allege and prove that the religious society to which she was attached taught and believed that it was sinful for her to live with him because she was sanctified and he was an unbeliever.   It was very improper to admit proof of other separations, or of a single one, where the wife was a member of the band or sect and the husband was an unbeliever.

The plaintiff wholly failed to prove that his wife abandoned him or that she was ever guilty toward him of excesses or cruel treatment of any description.   It on the contrary shows that he was first unkind, then violent, and that he afterwards abandoned both her and the country. For years he seems to have entirely omitted to contribute to the support of his wife or children, casting that burden upon his wife entirely.

It is unnecessary for us now to express an opinion upon the effect of his offer by letter in 1883 to resume his marital relations with defendant if she would join him with their children at his then residence in Central America, or of a similar proposition made to her in person in 1886.

It seems to be well established that "the husband has the right to decide where the matrimonial domicile shall be; and if he changes his residence and the wife declines to go with him she thereby deserts him." 1 Bish. on Mar. and Div., sec. 788.

While this rule has been held to apply to emigration to a foreign government as well as a sister State, other principles, involving among others questions of health and conditions of civilization, may limit its application.   There are many places to which the wife of an inhabitant of this State would not be required to change her domicile or be held guilty of the desertion of her husband so as to entitle him to divorce for that cause.

When the other elements of abandonment exist and the question of change of domicile by the husband becomes a question, the defense must be put on that ground, when its merits will be determined by the circumstances of the particular case.

As other questions control the disposition of this cause we do not deem it necessary to say more on this subject.

The parties had when the suit was brought a son aged ten years and two daughters, one twelve and the other eight years old.   For six years before suit was brought these children had been maintained by their deserted mother, with no thought or care from their father, so far as the record discloses, except to send them a half barrel of oranges and to allow

their mother during part of the time to take the fifteen dollars per month which the rent of their homestead brought, of which he deprived her two years before he brought his suit.

At the time of the trial the son was in the State of Michigan, to which place plaintiff had recently removed him without the consent of his mother. The two daughters testified at the trial that they wanted to live with their mother and not with their father.

The father proved that he had property in Central America adequate to the maintenance of the children. The mother proved that since they were abandoned to her in 1881 she had maintained and educated them, and could still do so. The court gave the custody of all of the children to the husband by an order taking immediate effect.

Article 2871 of our Revised Statutes reads: "The courts aforesaid shall have power in all cases of separation between man and wife to give the custody and education of the children to either father or mother as to the said court shall seem right and proper, having regard to the prudence and ability of the parents and the age and sex of the child or children, to be determined and decided on the petition of either party; and in the meantime to issue an injunction or make any order that the safety and well being of any such children may require."

No more sacred trust or graver responsibility can be devolved upon a court than the duty of determining which one of two contending parents shall have control of their minor children.

It is a question of the welfare of the child rather than of outrage to the affections of a mother, and one that should be solved by all the circumstances and conditions surrounding the parties at the time the final order shall be made.

Notwithstanding we are not able now to see that these children should have been forced away from the mother, who alone but willingly had for the past six years maintained and protected them, and bestowed upon a father who during all of these years had abandoned and neglected them, it still may be that under conditions that will exist at the final trial of this cause it may be obvious to the court that it should be done.

The judgment is reversed and cause remanded.

*Reversed and remanded.*

Delivered June 21, 1889.